IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JOSEPH CASEY, | HON. JEROME B. SIMANDLE |
| Plaintiff, | Civil No. 08-955 (JBS/JS) |
| v. | |
| COMMERCE CONSTRUCTION CORP. | **OPINION** |
| Defendant. | |

APPEARANCES:

Stanley B. Gruber, Esq.
FREEDMAN AND LORRY, P.C.
1601 Market Street
2nd Floor
Philadelphia, PA 19103
      Counsel for Plaintiff

Robert Neil Dengler, Esq.
FLICKER, GARELICK & ASSOCIATES, LLP
45 Broadway
New York, NY 10006
      Counsel for Defendant

**SIMANDLE**, District Judge:

## I.   INTRODUCTION

This matter is before the Court on Defendant Commerce Construction's motion for summary judgment [Docket Item 17]. Plaintiff Joseph Casey, who was employed by Defendant as a harbor worker, has sued Defendant in its capacity as vessel owner under 33 U.S.C. § 905(b), a provision of the Longshore and Harbor Workers' Compensation Act ("LHWCA") which permits suit against vessel owners for third-party negligence in maritime accidents.

Defendant contends that as a matter of law it was not negligent in its capacity as vessel owner.  Alternatively, Defendant argues that Plaintiff is barred from bringing suit because his employment responsibilities included repairing ships.

The principal issue presented for decision is whether, under the circumstances presented here, Plaintiff, as a harbor worker, can maintain this action against his employer, in its capacity as vessel owner, for personal injuries arising from the alleged negligence of the vessel, consistent with section 5(b) of the LHWCA, 33 U.S.C. § 905(b).  For the reasons discussed below, such a cause of action is viable but this motion cannot be decided as a matter of law since there are genuine disputes regarding material fact.  Therefore, Defendant's motion for summary judgment will be denied.

## II.  Background[1]

This negligence suit arises out of an incident that occurred on May 10, 2007, at Defendant's "Camden Yard" in Camden, New Jersey.  Plaintiff Casey was employed by Defendant as a harbor worker.  Injured in a fall from a walkway connecting two barges, Plaintiff has brought suit against Defendant in its vessel owner capacity pursuant to section 5(b) of the LHWCA, 33 U.S.C. §

---

[1] The facts are presented in the light most favorable to the nonmoving party, Plaintiff.

2

905(b).[2]  Plaintiff seeks more than $150,000 in relief from Defendant.  (Compl. ¶ 9.)

Defendant operates a construction business divided into marine and land divisions.  (Williams Dep. 9:21-24, Jan. 21, 2009.)  On the marine side, Defendant primarily specializes in pier and wharf construction and repair.  (Pl.'s Aff. ¶ 2.) Defendant maintains a fleet of barges which it uses to house cranes and other equipment for construction work as well as to shuttle materials between project sites.  (Williams Dep. 24:12-25:5.)  Some of the barges are owned by Defendant while others are leased long-term from C.C. Equipment Company.  (Id. 15:20-16:23.)  When not in use at construction sites, the barges are "parked" at the Camden Yard.[3]  (Pl.'s Aff. ¶ 3.)  In addition to housing barges, the Camden Yard functions as a place to get equipment and materials ready for use at marine construction sites.  (Id. ¶ 5.)

The relevant barges present at the Camden Yard on May 10, 2007, were the 4600 barge, the Hopper barge, and the Juno barge. (Williams Dep. 17.)  While the record does not reveal who tied up

---

[2] This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and admiralty and maritime jurisdiction under 28 U.S.C. § 1333.

[3] Defendant maintains a second yard, commonly referred to as the "Gloucester Yard," in Gloucester, New Jersey, which is mainly used for the storage of construction equipment.  (Williams Dep. 15:5-9.)

these barges, the responsibility generally fell to "Dock Builders."[4]  (Pl.'s Aff. ¶ 8; Williams Dep. 29:7-14.)  The common practice at the Camden Yard for securing the barges was to tie one barge to the pier and then string others outwards from it in a parallel fashion.  (Williams Dep. 21:11-14.)  On May 10th, the 4600 barge was tied to the pier with the Hopper barge coming second and the Juno barge following.  (Id. 21:11-22:19.)

When necessary, walkways[5] connecting the barges would be put into place.  On May 10th, a walkway with handrails connected the 4600 barge to the pier.  (Pl.'s Dep. 83:3-9, Jan. 21, 2009.)  A second walkway, this one without handrails, traversed the gap between the 4600 and Hopper barges.  (Id. 84:12-85:23.)  A final walkway, also lacking handrails, linked the Hopper and Juno barges.  (Williams Dep. 46:11-25.)  Neither the Hopper nor Juno

---

[4] Besides securing barges, "Dock Builders" at the Camden Yard prepared structures both on the barges and on shore for use at Defendant's marine construction sites.  (Pl.'s Aff. ¶ 4.) "Dock Builders" also undertook necessary maintenance and repair of the barges themselves.  (Id. ¶ 8.)

[5] Defendant and Plaintiff disagree over the proper term for the structures connecting the barges.  Defendant refers to them as "walkways" and Plaintiff as "planks."  Perhaps the more precise term functionally for what the structures were accomplishing is either "gangways" or "gangplanks."  See American Heritage Dictionary of the English Language (4th ed. 2000) (defining "gangplank" as "[a] board or ramp used as a removable footway between a ship and a pier.").  For purposes of this Opinion, this definition will be used interchangeably with "walkways," "(gang)planks," and "gangways."

barges could be accessed directly from the pier.  (Pl.'s Dep. 92:15-23.)

While crossing from the 4600 to the Hopper barge on May 10th, Plaintiff fell and suffered the injuries resulting in this suit.[6]  For nearly twenty years prior to the accident, Plaintiff had worked as an "Operating Engineer" for Defendant.  (Id. 22:8-10; Pl.'s Aff. ¶ 1.)  In this capacity, Plaintiff primarily repaired construction equipment aboard barges, both at project sites and at the Camden and Gloucester Yards.  (Pl.'s Dep. 33:18-34:22.)  Plaintiff estimates that he dedicated between eighty and ninety percent of his time to repair work (id. 29:16-30:4), nearly all of which was done in connection with Defendant's marine operations (id. 27:11-16).  When needed, Plaintiff operated heavy equipment, like bulldozers, cranes, and backhoes, and water craft, like tugboats.  (Id. 25:6-26:8.)  According to Plaintiff, his job responsibilities did not include making repairs to the barges themselves.[7]  (Pl.'s Aff. ¶ 6.)  Plaintiff

---

[6] Defendant claims that Plaintiff fell while walking from the Hopper barge to the Juno barge but accepts Plaintiff's version for purposes of this motion.  Considering that Defendant was the owner or owner pro hac vice of all three vessels in question, the specific walkway from which Plaintiff fell does not affect Defendant's liability as vessel owner.  Therefore, this Court will use Plaintiff's version of the events.

[7] Defendant disputes Plaintiff's assertion and claims that Plaintiff "was tasked to make repairs to the barges" (Williams Aff. ¶ 4) and that on May 10th Plaintiff was "carrying out repair work to the Juno barge" (id. ¶ 6).

did not have a designated supervisor but rather received
assignments from foremen, superintendents, and others whenever a
problem with equipment was reported.  (Pl.'s Dep. 35:21-36:17.)

Plaintiff does not remember who assigned him to work at the
Camden Yard on May 10th (id. 58:17-20), but recalls that he was
attempting to reach the Juno barge to repair a crane (id. 66:24-
67:10).  Plaintiff recollects that an employee who operated the
crane had reported a problem with it (id. 60:9-14) and that
Plaintiff had spent May 9th fixing the crane but had returned on
May 10th to finish repairs (id. 66:24-67:22).

Plaintiff, of course, never made it to the Juno barge as he
fell while walking from the 4600 barge to the Hopper barge.  (Id.
71-72.)  Plaintiff estimates that he fell between ten and fifteen
feet to the float stage below (id. 76:9-14) and suffered
extensive injuries, including fractured ribs, neurological
damage, and respiratory and tracheal problems (Compl. ¶ 9).
Besides this walkway, no other way existed for Plaintiff to get
from barge to barge.  (Id. 92:15-23.)

The walkway from the 4600 barge to the Hopper barge was
being used by Defendant as a means of "ingress and egress from
one barge to another."  (Def.'s Resp. to Pl.'s Interrogs. 4(e).)
Defendant owned all the walkways at the Camden Yard, and they
were stored at the yard when not in use.  (Williams Dep. 30:6-
18.)  Some walkways had been built by Defendant while others were

purchased from outside companies.  (Id. 30:19-24.)  The walkways

were not uniform and varied in length, shape, size, and materials

used.  (Id. 32:8-12.)  The walkway in question was twenty-four

inches wide, made of two wooden planks cleated together, and had

no handrail.  (Id. 33:21-34:5.)  When deciding whether walkways

with or without handrails should be used, Defendant did not

follow any particular protocol, nor did it have a written or

verbal policy on the matter.  (Id. 34:19-35:19.)

Plaintiff alleges that the safety conditions of the walkway

violated industry practice.  According to Plaintiff's expert

report, Occupational Safety and Health Administration ("OSHA")

standards mandate the installation of handrails when there is a

hazard of falling more than four feet from a vessel.  (Stoller

Report 7.)  The walkway from which Plaintiff fell was positioned

well above four feet, yet did not have a handrail.  (Pl.'s Dep.

76:9-14.)  Plaintiff's expert cites to other maritime safety

codes that mandate handrails for all gangways.  (Stoller Report

8.)  In its accident report, Defendant identified the absence of

a handrail as a contributing factor to Plaintiff's fall.

(Accident Report 1.)  Plaintiff also references OSHA standards

that require walking surfaces to be maintained to prevent people

from slipping.  (Stoller Report 7.)  Plaintiff's expert contends

that Defendant's failure to use a non-slip material on the

walkway might have contributed to Plaintiff's fall.  (Id.)

7

Since September 29, 2007, Defendant has paid Plaintiff temporary total disability compensation benefits under the LHWCA. (Boger Aff. ¶ 3.)  As of March 4, 2010, Plaintiff had received approximately $143,000 in compensation benefits from Defendant. (Id.)

## III. Discussion

### A.    Summary Judgment Standard

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the . . . [moving party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  In deciding whether there is a disputed issue of material fact, a court must view the evidence in the light most favorable to the nonmoving party.  Hunt v. Cromartie, 526 U.S. 541, 552 (1999).  "[T]he nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)) (alteration in original).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.

**B.    Liability of Defendant as Vessel Owner**

1.    A Vessel Owner's Duties of Care

The comprehensive worker's compensation scheme established through the LHWCA serves as the exclusive liability of employers to employees injured in the course of their maritime employment. 33 U.S.C. § 905(a); see also Morehead v. Atkinson-Kiewit, J/V, 97 F.3d 603, 607 (1st Cir. 1996) (en banc) (discussing legislative history of LHWCA).  Nonetheless, certain covered employees may bring suit against "the vessel as a third party if their employment injury was caused by the negligence of the vessel." Morehead, 97 F.3d at 607.[8]  In some cases, the employer of the injured worker may also be the owner of the vessel.  In these so-called "dual capacity" cases, employees providing "shipbuilding, repairing, or breaking services" are prohibited from bringing suit against the employer in its capacity as vessel owner.  33 U.S.C. § 905(b).  Persons employed by a vessel to provide stevedoring services and injured by the negligence of a fellow longshoreman are also barred from bringing suit in the dual capacity context.  Id.

---

[8] Section 905(b) provides in relevant part:  "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party . . . ."  33 U.S.C. § 905(b).

Besides these express statutory restrictions, the Third Circuit Court of Appeals has interpreted section 905(b) to allow suits against employer-owners, so long as they are acting in their capacity as vessel owners. Griffith v. Wheeling Pittsburgh Steel Corp., 521 F.2d 31, 44 (3d Cir. 1975) (finding that a pro hac vice owner of a vessel was not immune from suit by an injured employee for vessel negligence); Lacount v. Southport Enterprises, No. 05-5761, 2007 U.S. Dist. LEXIS 47049, at *20 (D.N.J. June 29, 2007); see also Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 530-32 (1983) (reasoning that section 905(b)'s restrictions on certain dual capacity cases would have been unnecessary if all such cases were barred); Gravatt v. City of New York, 226 F.3d 108, 119 (2d Cir. 2000) ("It is not disputed that an employee of a dual-capacity employer-owner retains his right to sue the vessel for negligence under section 905(b).") (emphasis in original); Morehead, 97 F.3d at 608 ("The [1984] Amendments [to the LHWCA] did not purport to prohibit LHWCA employees other than in the described categories from suing for negligence in dual capacity cases.").

When interpreting the LHWCA, courts have typically divided covered employees into two categories:  longshoremen[9] and harbor

---

[9] Longshoremen generally load and unload cargo on vessels. See Black's Law Dictionary (8th ed. 2004) (defining "longshoreman" as "[a] maritime laborer who works on the wharves in a port; esp., a person who loads and unloads ships.").

workers.[10]  While the Supreme Court has not addressed the duty of
care a vessel owner owes to harbor workers, the Court has
identified three narrow circumstances in which vessel owners have
responsibilities to longshoremen who work for independent
stevedores.  See, e.g., Scindia Steam Navigation Co. v. De los
Santos, 451 U.S. 156 (1981).  These Scindia duties are:  (1) the
"turnover duty," (2) the "active control of the vessel" duty, and
(3) the "duty to intervene."  Howlett v. Birkdale Shipping Co.,
512 U.S. 92, 98 (1994).  The "turnover duty" concerns the state
of the vessel when the stevedoring operations commence.  Id.
"The shipowner thus has a duty with respect to the condition of
the ship's gear, equipment, tools, and work space to be used in
the stevedoring operations."  Scindia, 451 U.S. at 167.  For
those areas of the ship, if any, which remain in the "active
control of the vessel" after stevedoring operations have begun,
vessel owners must "exercise reasonable care to prevent injuries
to longshoremen."  Howlett, 512 U.S. at 98.  Lastly, there may be
dangerous conditions that arise during the stevedoring operations
which require the vessel owner to intervene and correct them.
Id.

   The Third Circuit Court of Appeals in Kirsch v. Plovidba
more fully outlined a shipowner's duties when turning over a ship

_____

   [10] This second category of workers under the LHWCA functions
as a catch-all category for those who do not fit the definition
of a longshoreman but are nonetheless covered by the Act.

11

to an expert stevedore.  971 F.2d 1026, 1029 (3d Cir. 1992).  The
appeals court noted that a vessel owner generally can reasonably
rely on the stevedore "to notice obvious hazards and to take
steps consistent with its expertise to avoid those hazards where
practical to do so."  Id. at 1030.  "Thus, where a danger is
obvious but easily avoidable, the shipowner will not be liable
for negligence."  Id.  However, "a shipowner may be negligent for
failing to eliminate an obvious hazard that it could have
eliminated, but only when it should have expected that an expert
stevedore could not or would not avoid the hazard and conduct
cargo operations reasonably safely."  Id. at 1031.

The Third Circuit Court of Appeals in Sarauw v. Oceanic
Navigation Corp. held, at least in the context of stevedoring,
that vessel owners must provide and maintain a safe means of
access to and from their ships.  655 F.2d 526, 528 (3d Cir.
1981).  The court ruled that a gangway used for embarking and
disembarking from a ship is considered "a basic appurtenance of
the vessel."  Id.  In Sarauw, the gangway in question was
actually provided by the stevedoring firm, not the vessel itself.
Id.  Nonetheless, the Court found that the shipowner had a "duty
to exercise reasonable care with respect to the gangway's being
properly secured to the vessel and maintained in safe condition
for use."  Id.  The fact that the stevedoring company had itself

supplied the gangway did not relieve the vessel owner of its duty to ensure safe passage onto the ship.[11]  Id.

Much like the Third Circuit Court of Appeals, numerous circuits have held that as part of its "turnover duty" a vessel owner must ensure that people can safely enter and exit the ship. See, e.g., Scheuring v. Traylor Bros., Inc., 476 F.3d 781, 790 (9th Cir. 2007) ("[T]he turnover duty . . . requires a vessel to provide a safe means of access."); Gay v. Barge 266, 915 F.2d 1007, 1012 (5th Cir. 1990) (holding that the vessel had a duty to provide "a safe means of access" when turning over the vessel to stevedores); Romero Reyes v. Marine Enters., 494 F.2d 866, 870 (1st Cir. 1974) ("The [vessel] owner is . . . liable for a negligent failure to inspect a gangway and to warn against defects reasonably apparent from inspection or to take steps to repair or replace it.").

Neither the Supreme Court nor the Third Circuit Court of Appeals has ruled whether the liability imposed on a vessel owner in a dual capacity case is the same as that imposed in the single capacity context.  However, all the circuits that have addressed

---

[11] Notably, the Third Circuit Court of Appeals decided Sarauw before the Supreme Court's Scindia decision, which laid out the foundational framework for vessels' duties to longshoremen.  The Supreme Court vacated the decision and remanded the case to the Third Circuit Court of Appeals for reconsideration.  Sarauw, 655 F.2d at 528.  Taking into account Scindia, the Court reaffirmed its earlier holding that vessels had a duty to stevedores to ensure safe ingress and egress.  Id.

the issue have held that the same liability should be imposed.
See, e.g., Gravatt, 226 F.3d at 124-25; Morehead, 97 F.3d at 613;
Castorina v. Lykes Bros. SS., 758 F.2d 1025, 1033 (5th Cir.
1985).  These circuits agree that the Scindia duties should form
the basis of liability analysis in dual capacity cases, but that
the duties can be more easily applied in some instances than in
others.[12]  See, e.g., Gravatt, 226 F.3d at 124-25; Morehead 97
F.3d at 613 ("[T]he duties of care described in Scindia should be
applied in dual capacity cases insofar as the facts allow.");
Castorina, 758 F.2d at 1033 ("[T]he duty owed by a shipowner to a
longshoreman under section 905(b) is that established by Scindia
and its progeny; this duty is neither heightened nor diminished

_____

[12] The concern with strictly applying the Scindia duties in
the dual capacity context is that the vessel owner might end up
with greater liability than it would have had in a single
capacity case.  Generally, the reason for this increased
liability is the difficulty in distinguishing the company as
employer and the company as vessel owner.  For instance, if a
foreman working on a marine construction barge knows that a
railing on the barge is unsteady because a crane operator whacked
it with a crane and then a fellow worker leans on the railing,
falls, and gets injured, would the company as vessel owner be
liable?  If strictly applied, Scindia would say yes because the
vessel owner employed the foreman, would have had knowledge of
the dangerous condition imputed to it, and therefore would have
had a duty to intervene to rectify the problem.  In the single
capacity context, though, the vessel owner would not be liable
because the construction company would have hired the foreman,
and as such, the vessel owner would not have had his negligence
imputed to it.  To ensure the same liability in the dual and
single capacity contexts, then, the Scindia duties by themselves
may not be sufficient.  Notably, the analysis will be fairly
straightforward for a vessel's "turnover duty" and more
complicated for the "active control" duty and the "duty to
intervene."  Gravatt, 226 F.3d at 122-23.

14

when the longshoreman is employed directly by the vessel.").

A further complication still unresolved by either the Supreme Court or the Third Circuit Court of Appeals is how the Scindia duties for longshoremen translate to the harbor worker context.  All the circuits that have addressed the issue have concluded that courts should hold vessel owners to the same standards with regards to longshoremen and harbor workers.[13] See, e.g., Scheuring, 476 F.3d at 789 n.6 ("[T]he vessel owner's duties as to longshore workers . . . applies with equal force to that owed to harbor workers."); Gravatt 226 F.3d at 124 n.15 (noting that some instances might arise where Scindia is hard to apply in the harbor worker context but that the Scindia duties form an "appropriate starting point"); Morehead, 97 F.3d at 613 (applying Scindia's "active control of the vessel" duty equally to longshoremen and harbor workers).

    2.   Defendant's Duty to Turn Over Vessel with Reasonably Safe Gangways

        a.   Plaintiff's Status Under the LHWCA

The Court finds, and neither party disputes, that Plaintiff was an employee covered under the LHWCA and no evidence in the

---

[13] The First Circuit Court of Appeals notes that harbor workers' "duties and modus operandi often differ considerably from those of longshore workers."  Morehead 97 F.3d at 610.  The court does not elaborate on what those differences might be, and in the end, applies the Scindia duties equally to longshoremen and harbor workers.

record reveals otherwise.[14]  Plaintiff estimates that eighty to
ninety percent of his daily work with Defendant was marine-based.
(Pl.'s Dep. 30.)  Most conclusively, Defendant has paid workers'
compensation to Plaintiff under the LHWCA since September 29,
2007, something it would only do if it considered Plaintiff an
employee covered by the Act.

> b.  Definition of "Vessel" Under the LHWCA

Additionally, the Court finds, and neither party disputes,
that Plaintiff was injured while on a "vessel."  Section 905(b)
permits an LHWCA employee to sue in negligence only "in the event
of injury . . . caused by the negligence of a <u>vessel</u>."  33 U.S.C.
§ 905(b)  (emphasis added).  For purposes of the LHWCA, the
Supreme Court has defined "vessel" as "any watercraft practically
capable of maritime transportation, regardless of its primary
purpose or state of transit at a particular moment."  <u>Stewart v.
Dutra Constr. Co.</u>, 543 U.S. 481, 497 (adopting U. S. Code's
default definition of "vessel" as codified in 1947 Rules of
Construction Act).

The 4600 barge, Hopper barge, and Juno barge, although
docked in the Camden Yard on May 10th, would be used when needed

---

[14] A statutorily covered employee is "any person engaged in
maritime employment, including any longshoreman or other person
engaged in longshoring operations, and any harbor-worker
including a ship repairman, ship-builder, and ship-breaker."  33
U.S.C. § 902(3).

by Defendant to transport materials to marine construction sites.
Based on the evidence in the record, these barges qualify as
"vessels" under the LHWCA, which means that their owner,
Defendant, may be sued under 33 U.S.C. § 905(b) for vessel
induced negligence.

          c.    <u>Defendant Acting in Its Capacity as Vessel
Owner</u>

Taking into account controlling and persuasive precedent,
this Court finds that Defendant, in its capacity as vessel owner,
had a duty to ensure that its gangways would be reasonably safe
for use by experienced harbor workers.  Plaintiff has submitted
evidence suggesting that Defendant did not meet this "safe
access" duty.  Whether Defendant met its duty presents a genuine
dispute of material fact that should be left to the trier of fact
to resolve.

In its motion for summary judgment, Defendant adopts the
approach of the First and Second Circuit Courts of Appeals when
analyzing dual capacity cases.  In other words, Defendant
constructs a hypothetical whereby the vessel owner and employer
are different entities, like in the single capacity case, and
assesses what liability, if any, the vessel would incur.  Under
Defendant's hypothetical, the vessel owner turns over its barges
to a shipyard, which is operated by a distinct company.  The
shipyard owns walkways which its employees secure between barges

so that they can carry out repairs to the vessels.  Defendant concludes that the vessel owner, who has turned over the barges to the shipyard, has no duties with regards to the gangways and should be relieved of any liability.  Defendant argues that the same result should be reached in the dual capacity context where the company is both vessel owner and employer of shipyard workers.

Defendant's theory of the case, while apposite, is flawed in several respects.  Defendant in its hypothetical fails to discuss the vessel owner's Scindia duties, specifically its "turnover duty" to the shipyard's harbor workers.[15]  As the Third Circuit Court of Appeals held in Kirsch, vessel owners have a certain duty of care when turning over a vessel to independent stevedores.  971 F.2d at 1030.  That duty includes turning over a vessel that can be safely accessed.  Sarauw, 655 F.2d at 528.  The First, Fifth, and Ninth Circuit Courts of Appeals have imposed a similar "safe access" duty on vessel owners when

_____

[15] While the Second Circuit Court of Appeals has suggested that the Scindia duties may "become no more than a point of departure" for some dual capacity cases, those cases  will generally involve the "active control duty" and the "duty to intervene."  Gravatt, 226 F.3d at 122-25 ("The application of Scindia's second and third prongs -- the active control duty and the duty to intervene upon actual knowledge -- to the circumstance where the harbor-work contractor and the owner of the vessel are the same entity is more problematic.").  Given that the facts of this case invoke Defendant's "turnover duty," this Court finds that Scindia can be directly applied and that such application leads to the same liability in the dual and single capacity context.

turning over their ships.  See, e.g., Scheuring, 476 F.3d at 790; Gay, 915 F.2d at 1012; Romero, 494 F.2d at 870.  This Court sees no basis for concluding that such a duty does not apply to the harbor worker context.[16]  The mere fact that the vessel owner is also an employer does not relieve it of its obligations as vessel owner.  Jones, 462 U.S. at 530-32; Gravatt, 226 F.3d at 119; Morehead, 97 F.3d at 608; Griffith, 521 F.2d at 44.  Critically, as the Third Circuit Court of Appeals held in Sarauw, a vessel owner's "safe access" duty does not depend on whether it or an outside entity supplied the gangways.  Sarauw, 655 F.2d at 528.  Therefore, whether Defendant provided the walkway in question in its employer or vessel owner capacity is immaterial to its ultimate liability.

For these reasons, the Court holds that Defendant in its capacity as vessel owner had a duty to provide safe access to its barges docked in the Camden Yard on May 10th.  With regards to this duty, Plaintiff has put forward evidence from which a reasonable jury could find that Defendant acted negligently. Plaintiff's principal claim is that Defendant by providing a walkway for vessel access without handrails failed to comply with

_____

[16] Notably, the Ninth Circuit Court of Appeals in Scheuring found no distinguishable differences between longshoremen and harbor workers and extended the "safe access" duty to harbor workers.  476 F.3d at 790.

industry safety standards.[17]  Plaintiff's expert cites OSHA and other industry codes which require the installation of handrails when a walkway is positioned high enough above the ground, as was allegedly the case here.  (Stoller Report 7.)  Furthermore, Defendant's accident report on the incident cites the lack of a handrail as a contributing factor to Plaintiff's fall.  (Accident Report 1.)

The question of whether Defendant fulfilled its "safe access" duty is for the trier of fact to resolve, and as such, summary judgment is inappropriate.

### C.   Plaintiff's Ability to Bring Suit under the LHWCA

Even if Defendant could be found negligent in its capacity as vessel owner, it moves for summary judgment on the grounds that Plaintiff is barred from bringing suit under section 905(b) of the LHWCA because his job responsibilities included repairing ships.  Section 905(b) provides in relevant part:  "If . . . [the injured] person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no . . . [legal] action shall be permitted."  33 U.S.C. § 905(b).

---

[17] Plaintiff also claims that Defendant's failure to use a non-slip material on the walkway might have contributed to his fall.  (Stoller Report 7.)  In support of this claim, Plaintiff's expert cites an OSHA standard regarding an employers' duty to maintain safe walking surfaces.  (Id.)

Neither the Supreme Court nor the Third Circuit Court of Appeals has defined "ship-repairing," but other circuits offer some guidance.  The Fifth Circuit Court of Appeals defines ship repairing as restoring a ship to "a sound or healthy state."  New v. Associated Painting Services, Inc., 863 F.2d 1205, 1210 (5th Cir. 1989).  The appeals court distinguishes between repair and maintenance.  Repair work means to "restore a vessel to safe operating condition" while maintenance work means to "preserve the vessel's current condition."  Id.  "When classifying an employee for purposes of determining whether a suit under § 905(b) is barred, we look not only at what the employee was doing at the moment he was injured.  We also look at whether the employee 'regularly performs some portion of what is indisputably [ship-repair] work' . . . ."  Gay, 915 F.2d at 1010 (quoting Boudloche v. Howard Trucking Co., 632 F.2d 1346, 1347-48 (5th Cir. 1980)); accord Heise v. Fishing Co., 79 F.3d 903, 908 (9th Cir. 1996) (adopting Fifth Circuit Court of Appeals' interpretation of what "ship-repairing" means).

Analogizing this understanding to the present case, Plaintiff would be barred from bringing suit against Defendant under section 905(b) if he regularly performed "ship-repair" work.  Plaintiff avers that his job responsibilities as an "Operating Engineer" for Defendant did not involve making repairs to the barges themselves, only to the construction equipment on

21

them.  (Pl.'s Aff. ¶ 6.)  Defendant, meanwhile, claims that
Plaintiff regularly made repairs to Defendant's barges.
(Williams Aff. ¶ 4.)  Besides an Affidavit from a "Project
Manager," Defendant offers no evidence to prove this assertion.
As such, a genuine issue of material fact exists regarding
whether Plaintiff regularly performed "ship-repair" work and is
thus barred from suit under section 905(b).  Again this is an
issue for the trier of fact to resolve, and thus, summary
judgment is inappropriate.

## IV.  Conclusion

Given the statutory framework of the LHWCA, a vessel owner's
liability is limited under 33 U.S.C. § 905(b).  Nonetheless, the
Court concludes that there will be circumstances, like in the
present case, where a vessel owner must exercise a certain duty
of care when turning over its vessel, and if found negligent in
that duty, can be held liable.  The turnover duty includes the
duty to provide reasonably safe access to the vessel for harbor
workers.  Critically, this duty does not change based on whether
the employer of the injured worker or a separate entity owns the
vessel or whether the employee is a longshoreman or harbor
worker.  In the present case, Defendant in its capacity as vessel
owner has potentially failed in its duty to provide a safe means
of access to its barges, which if proven would result in
liability for Defendant.  A material dispute also exists

22

regarding whether Plaintiff regularly performed "ship-repair" work.  For these reasons, Defendant's motion for summary judgment will be denied and the accompanying Order will be entered.

_July 8, 2010_
Date

_Jerome B. Simandle_
JEROME B. SIMANDLE
United States District Judge